**UNITED STATES of America ex rel. Philip ORLANDO, Relator-Appellant,**

v.

**Edward M. FAY, Warden of Green Haven Prison, Stormville, New York, Respondent-Appellee.**

**No. 500, Docket 29542.**

United States Court of Appeals Second Circuit.

Argued May 26, 1965.

Decided Sept. 23, 1965.

---

5. The Bankruptcy Act denies a discharge to a bankrupt who has violated this provision of 18 U.S.C. § 151.

Myron L. Shapiro, New York City (Richard J. Burke and Burke & Shapiro, New York City, on the brief), for relator-appellant.

Joel Lewittes, Asst. Atty. Gen. State of New York (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., and Iris Steel, Deputy Asst. Atty. Gen., on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge:

Philip Orlando attacks, by petition for a writ of habeas corpus filed in the Southern District of New York in October 1963, his 1950 New York State con-

viction and thirty-to-sixty year sentence for robbery in the first degree, grand larceny first degree and assault second degree. He alleges that he was denied a public trial because the state trial court excluded the public from the courtroom during most of the trial. State remedies having been exhausted,[1] Judge Sugarman held a hearing and denied the application. We agree with his conclusion that there has been no deprivation of Orlando's constitutional rights.

Orlando's trial opened in Kings County Court on October 24, 1950 before Judge Goldstein. On the first full day of trial, October 26th, Orlando interrupted an identification of him by the victim by exclaiming, "You never saw me before," "You liar," and "This man is not supposed to say that, your Honor," and was strongly admonished by the court.

The next day of trial, October 30th, the prosecution disclosed, out of the presence of the jury, that one prosecution witness had been threatened by two members of the electrical union to which Orlando belonged with loss of his job if he testified against Orlando, and that another prosecution witness had avoided what might have been a similar situation by telling the man who accosted her in a suspicious manner that she was someone else. In the absence of the jury, Judge Goldstein admonished all those present, saying:

> "Whoever is responsible for this kind of conduct toward the People's witnesses, and if I find out who it is, I will hold an investigation on that after this trial is over. I do want to say as a warning, that if there is anybody doing this dirty work and trying to intimidate the witnesses here, they are going to be dealt with according to law; and I again want to issue a warning,

that if there is anybody in this court-room, that is interested in this defendant, or in this Electrical Union, that is taking advantage of the fact that they are spectators, and gain information and then use it on the outside to abuse these witnesses, that come here, they will find themselves in a very serious situation. We will go on with the case now."

But Judge Goldstein's troubles had not ended, for later in the afternoon, the record discloses the following:

> "Q. You had used the name 'Orlando.' Do you see the man who came into your apartment on March 10, 1950, who was armed with a gun with Lorenzo? Do you see him in Court here? A. Yes, sir.
>
> Q. From your chair will you pick him out? A. Yes, sir, that is him right there.
>
> Q. Where is he? A. Right over there (indicating).
>
> Mr. De Meo: Indicating this defendant.
>
> The Defendant: Do you want me to stand up?
>
> The Court: Will you keep quiet.
>
> The Defendant: Do you want me to stand up?
>
> The Court: Look here, you keep quiet.
>
> The Defendant: The witnesses are all lying, your Honor.
>
> The Court: I will hold you in contempt of court if you continue in this manner. Do you understand that? You are not out on the street. You are in a court-room. At least you ought to show some respect for the court.

A woman [admittedly defendant's mother, who was a spectator at the

---

1. Orlando's conviction was affirmed without opinion by the New York State appellate courts, 279 App.Div. 664, 108 N.Y.S.2d 979 (2d Dept. 1951), 304 N.Y. 805, 109 N.E.2d 345 (1952), reargument denied, 308 N.Y. 943, 127 N.E.2d 93, motion to amend remittitur denied, 308 N.Y. 1007, 127 N.E.2d 854 (1955), motion for reargument denied, 9 N.Y.2d 1015, 218 N.Y.S.2d 1025, 176 N.E.2d 594 (1961), cert. denied, 368 U.S. 990, 82 S.Ct. 605, 7 L.Ed.2d 527 (1962). The issues raised in this proceeding were raised in the state courts.

trial]: May I say something? He is my boy. Listen to what they say.

The Court: I will clear the court-room of all spectators. Do not leave anybody in this court-room after this, except the witnesses when they are needed. Do you understand that?"

About one half hour after Judge Goldstein had excluded the spectators, during the testimony of a co-defendant who was testifying for the prosecution, the defense first moved to readmit the public. Judge Goldstein denied this motion except to the extent of admitting the press and members of the bar.[2] In ruling that no one else be admitted, the court stated:

"In view of the exhibition that took place this morning among the spectators, who were apparently interested in the defendant, who made the statement 'That is not so' * * * I think I will exclude the audience

* * * except the press and the lawyers."

Still later the same day Orlando interrupted the testimony of a prosecution witness by exclaiming "That is a lie," and he was again admonished by Judge Goldstein.[3]

Judge Sugarman rejected Orlando's contention that the exclusion of the spectators was itself a violation of due process by reason of the Sixth Amendment guarantee of a "public trial." However, he directed a hearing on the claim that the exclusion order had made it impossible for Orlando to secure evidence to support his claim that he was at work at a certain time, contrary to the testimony of one of the state's principal witnesses. After a hearing, the district court ruled that Orlando had failed to sustain his burden of showing that his defense had been improperly hampered by exclusion of the spectators.

■ In our view, the record amply supports the conclusion that Orlando's right to a public trial was not denied. The trial judge had good reason to believe that many persons in the courtroom were acting so as to interfere with the orderly conduct of the trial. There was good reason for the judge to believe that the defendant's family and friends, including members of his union, at the behest and for the benefit of the defense, were attempting to intimidate and harass witnesses and otherwise to disrupt the proceedings. Under such circumstances the trial judge must exercise his power to exclude those who so act and those who appear to be acting in concert with them lest it be impossible for the trial to proceed and for the jury to pass upon the charges. As we conclude that the defendant was accorded a public trial in any event, we need not examine Orlando's assertion of a Sixth Amendment right and his claim that Gaines v. State of Washington, 277 U.S. 81, 85, 48 S.Ct. 468, 72 L.Ed. 793 (1928), which held that the Sixth Amendment guarantee of a public trial was not directly applicable to state trials, is to be re-examined in the light of recent Supreme Court decisions which incorporate some of the Sixth

2. The record does not disclose whether representatives of these groups were present at the trial, or whether anyone other than Orlando's family and members of the electrical union were present at the trial or sought admittance after the exclusion of spectators.

3. "Q. And isn't it a fact that at that time you turned over to the detective this watch, People's Exhibit 2?

The Defendant: That is a lie.

The Court: Mr. Rosenthal.

Mr. Rosenthal: Yes, Your Honor.

The Court: There ought to be some means of keeping this man subdued, and I do not want these outbreaks on his part, or acting on his part. It is about time you brought him to his senses, and stop his fooling around in this fashion. He has had experience. He ought to know better than that.

* * * * *

I instruct the Jury to disregard that remark. I want the court attendants to subdue him if he tries to get up, or makes any outbreak at any time. That is what you are there for, to use physical force if necessary to put him back in his seat."

Amendment rights into the Fourteenth Amendment.[4]

[2–4] The Sixth Amendment provision that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, * * *" has always been interpreted as being subject to the trial judge's power to keep order in the courtroom. Were this not so a public trial might mean no trial at all at the option of the defendant and his sympathizers. See Davis v. United States, 247 F. 394, 395 (8 Cir. 1917). Thus, the public trial requirement is subject to the trial judge's power to prevent offensive evidence from being exhibited to the public, Lancaster v. United States, 110 U.S.App.D.C. 331, 293 F.2d 519 (1961), to prevent unnecessary pressures or embarrassment to a witness or a victim as in the rape of a young child, Geise v. United States, 262 F.2d 151 (9 Cir. 1958), or to prevent young persons from attending a trial of a scandalous nature, United States v. Kobi, 172 F.2d 919, 924 (3 Cir. 1949). And where, as in Orlando's trial, there is reason to believe that unrestricted admission of the defendant's sympathizers to the courtroom has made it possible for such sympathizers to see the witnesses and then threaten and intimidate them, and there is reason to believe that this might continue unless such persons are not permitted to see the witnesses, the trial judge has the power to bar access to the courtroom to such persons.

■ Judge Goldstein's order to bar the public, except for members of the press and the bar, was not an unreasonable method of meeting the emergency situation which confronted him when it became apparent that both in and out of the courtroom the defendant and his sympathizers were attempting to prevent the orderly presentation of the case. Since the order still permitted access to the press and the bar the trial would in nowise be a secret trial, and the general public could be informed if need be regarding any irregularity or unfairness in the proceedings. Mr. Justice Black, writing for the majority in In re Oliver, 333 U.S. 257, 266–272, 68 S.Ct. 499, 92 L.Ed. 682 (1948), pointed out that the incorporation of the "public trial" protection in the Bill of Rights was primarily a reaction to the gross abuses in the secret proceedings of the English Star Chamber, the Spanish Inquisition and the use of the French lettre de cachet. See also, Estes v. State of Texas, 381 U. S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, 546, 548 (1965); Ashcraft v. State of Tennessee, 322 U.S. 143, 154–155 n. 10, 64 S.Ct. 921, 88 L.Ed. 1192 (1944). Judge Goldstein's ruling struck an acceptable balance between the requirement that the actions of the courts be open to public scrutiny and the need to have the trial proceed in an orderly manner.

■■ The guarantee of a public trial does not mean that all of the public is entitled under all circumstances to be present during the trial. It means only that the public must be freely admitted so long as those persons and groups who make up the public remain silent and behave in an orderly fashion so that the trial may continue. When the trial judge has reason to believe that any persons or any groups of spectators are disorderly and may continue to be so he may exclude individuals or groups as the occasion requires. Judge Goldstein's action excluded those who had created the disorder and the danger of tampering with witnesses and, within a few minutes thereafter, upon the defense's first objection, permitted the entry of the press and the bar.

■ Unfortunately, Judge Goldstein died prior to the hearing before Judge

4. See, Gideon v. Wainwright, 372 U.S. 355, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965) (confrontation of witnesses); Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (same); see also, Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L. Ed.2d 653 (1964) (incorporation of the Fifth Amendment privilege against self-incrimination).

Sugarman in October 1964. Doubtless he could have given additional reasons for his action and could have explained in further detail the actions of the spectators and also the circumstances surrounding the trial which required him to have the corridors on the floor on which the courtroom was located cleared of all spectators at the time of the verdict and to have the police riot squad come to the court house on the day when Orlando was sentenced. It seems obvious that the situation which the trial judge faced was not fully reflected in the black and white of the stenographer's minutes. We think it proper to give some weight to the fact that it was thirteen years after the conviction before Orlando petitioned the federal court.

■ Orlando argues further that the exclusion of spectators, except for the press and the bar, prejudiced the conduct of his defense. See Reagan v. United States, 202 F. 488 (9 Cir. 1913). He asserts that he was precluded from producing evidence to refute part of the testimony of a co-defendant, Cirincione, who was called as a prosecution witness. On cross-examination, Cirincione testified that he, Orlando and Lorenzo, another co-defendant, met at 4:00 P.M. on March 10, 1950, the date of the crime. Lorenzo, also called by the state, testified on cross-examination that he and Orlando had been together on the day of the crime from noon until after the commission of the crime at about 9:00 P. M., and that Cirincione had been with them from noon to 6:00 P.M. The defense called Diane Botton, bookkeeper for Orlando's employer, in an attempt to establish that Orlando had been at work from 8:30 A.M. until 3:30 P.M. that day. Her testimony was ruled inadmissible because of the lack of personal knowledge.

Orlando maintains that the exclusion of his family and union associates from the courtroom during this testimony prevented their finding witnesses who would testify to the same effect as Miss Botton's excluded testimony. The dis-

trict court found, and we agree, that no prejudice resulted. As soon as Miss Botton's testimony was stricken from the record, Orlando's trial counsel relayed this information to Orlando's father, who was immediately outside the courtroom together with Orlando's sister and brothers. Orlando did not request an adjournment. At the hearing before the district court, Orlando's trial counsel testified that Orlando's father had in fact made unsuccessful attempts to locate a witness who would testify that Orlando worked until 3.30 P.M.[5]

Even if this testimony had been produced, and there is no suggestion that such evidence ever was available, it would have merely impeached Lorenzo's credibility. It would not have directly contradicted the testimony relating to the commission of the robbery which took place at approximately 9:00 P.M. The testimony of Lorenzo and Cirincione differed on the time when the three co-defendants first met on the day of the crime. Apart from this inconsistency, their testimonies relating to the commission of the crime were virtually identical, and the jury by its verdict believed them. We conclude that no violation of due process occurred as Orlando has made no showing that he was prejudiced by the trial judge's exclusion of the spectators.

Thus we conclude that the trial judge's exclusion of the public, except for those participating in the trial, and the press and the bar, was not a denial of due process of law.

Affirmed.

J. JOSEPH SMITH, Circuit Judge (dissenting):

I dissent. Whether or not the remark of defendant's mother and the alleged out of court conduct of some members of the electrical union justified their exclusion for the balance of the trial, there is no need apparent on the record for exclusion of all the public except for the press and bar.

---

5. Orlando's father and brothers were members of the electrical union to which Orlando belonged.